Russell Greer
PO BOX 46602
LAS VEGAS, NV 89114
801-895-3501
russellgreer30business@gmail.com
Pro Se Litigant

---

## IN THE UNITED STATES DISTRICT COURT FOR

## THE DISTRICT OF NEVADA

---

| | |
|---|---|
| **RUSSELL GREER,** an individual | **PLAINTIFF'S AMENDED MEMORANDUM IN SUPPORT FOR PRELIMINARY INJUNCTION** |
| Plaintiff | |
| v. | |
| **FREMANTLE PRODUCTIONS NORTH AMERICA, INC,** a corporation, **ET AL.** | Case No.: 2:21-cv-01905 |
| Defendant | Judge Richard F. Boulware, II |
| | Magistrate Judge Nancy J. Koppe |

1

**TABLE OF CONTENTS**

I.      SUMMARY OF ARGUMENT ...........................................................................3

II.     STATEMENT OF FACTS ..............................................................................3

III.    ARGUMENT .....................................................................................................4

      A.      Plaintiff Meets the Standards for a Preliminary Injunction. ...................4

            1.      Plaintiff Has a Reasonable Likelihood of Success on the Merits................4

            2.      Plaintiff will Suffer Irreparable Harm if the Injunction is Not Granted....................................................................................20

            3.      The Equities Weigh Heavily in Favor of Granting the Requested Relief……………………………………………………………20

            4.      Granting the Preliminary Injunction Will Advance the Public Interest ....................................................................................22

      B.      Plaintiff Should Not Be Required to Post a Bond. ................................22

IV.    CONCLUSION ..............................................................................................22

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiff Russell Greer respectfully submits the following memorandum of law in support of his motion for a preliminary injunction requiring Defendant Fremantle Productions North America, Inc and Marathon Productions  to allow him onto the 2022 season of the television show, *America's Got Talent,* which begins filming in April 2022.

**I.**                          <u>**NATURE OF THE MATTER**</u>

This is a case about whether the Americans with Disabilities Act allows a disabled man to request a modification of a rejection policy in order to participate in a reality television show. The summary of the matter is whether a Plaintiff can succeed on his claims and if he will be harmed by not having this injunction granted.

**II.**                          <u>**STATEMENT OF FACTS**</u>

On February 08, 2021, Plaintiff Russell Greer, a man with a significant facial disability (termed "moebious syndrome") auditioned for the reality TV show, *America's Got Talent* (hereafter referred to as "AGT"). This audition was made after a year of preparation, in which Greer worked with a producer to record the song Greer would do for the show, which said recording took place in February of 2020. The song cost about 600 dollars to produce, including production, vocals and mixing.

Greer then spent the rest of 2020 practicing said song, with his sights set on February 2021 as his targeted audition date. He even purchased a keytar, which is a keyboard shaped like a guitar that you strap over your shoulders and play like a guitar, for his audition to stand out. Because of Greer's disability, he cannot audition by himself or sing his song. So he needed to hire accommodations to be his voice and to help showcase his song because that is his talent: writing pop music. Now if Greer were a classical musician, he wouldn't need to invest in an accommodation, as that doesn't require help, just piano playing and maybe a backing track. Or if he were a dancer, he wouldn't need an accommodation, just a backing track. But since Greer is a

pop songwriter, that requires vocals and given his paralysis, he cannot clearly sing or express himself in general. For example, he has been denied jobs in law firms because lawyers claimed they needed assistants who "can speak clearly."

Greer looked in various places in Utah and was not finding talented individuals or people he felt comfortable paying to act as his accommodation. So September 2020, he made a plan of moving out of Utah and to Las Vegas, Nevada. December 2020, he moved to Vegas to help him find accommodations because Vegas is one of the "Entertainment Capitals of the World" and because AGT offers its winner a show in Vegas and so Greer wanted to be close to Vegas on the chance he won the show or on the chance, he made a Vegas connection from the show.

The end of December 2020, Greer retained a talented singer, a drummer and a back up dancer that were all designed to accommodate Greer's act to help him convey his talent as a pop songwriter. At no point were they retained to form an actual band. They were retained to help convey Greer's talent.

February 8th, 2021, the band auditioned over a Zoom audition. The producer liked the audition and encouraged Greer to submit online videos. Greer did. Greer was so optimistic he would be selected. But he never was. He was severally hurt emotionally by the rejection and was hurt that everyone at Fremantle ignored his modification requests, which said requests were made in a six month period.

**III.**                                   <u>**ARGUMENT**</u>

    **A**. **Plaintiff Meets the Standards for a Preliminary Injunction.**

The ADA authorizes injunctive relief to remedy acts of discrimination against persons with disabilities. *42 U.S.C. §121888(a)(1).* To obtain a preliminary injunction, plaintiff must demonstrate that he is likely to succeed on the merits and suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in his favor and a preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 374 (2008). As

established below, Plaintiff has made the requisite showing for issuance of the requested preliminary injunction.

1. **Plaintiff Has a Substantial Likelihood of Success on the Merits.**

    A. <u>**Plaintiff's Title III Claim Will Succeed Because Plaintiff Can Successfully Prove All Four Elements of Claim to Prevail**</u>

The ADA was created to protect disabled Americans in all facets of life, hence why Title III's protections range from movie theaters to restaurants to entertainment entities. Although there are no cases quite like Plaintiff's, where a disabled contestant asked for modification of a rejection, the ADA was meant to apply to all situations. "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'" *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206 (1998).

To prevail on a Title III reasonable modification ADA claim, Plaintiff must show: "(1) he is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability." *Fortyune v. American Multi-Cinema Inc*, 364 F.3d 1075 (9th Cir. 2004).

There is already controlling Supreme Court law that mirrors the present case: *PGA Tour, Inc v. Martin,* 532 U.S. 661 (2001). In that case, a golfer with a leg abnormality requested a modification to use a golf cart in his golfing tournament. The Supreme Court found that allowing carts didn't fundamentally alter the tournament. Plaintiff relies heavily on Martin, as the facts are nearly identical in a lot of ways: both plaintiffs wanted to compete in tournaments, but were disadvantaged in relevant ways that were important in competing in the game.

Although the facts are identical in many ways, the two cases do differ as well. Imagine if *Martin's* facts were changed to match the present case. What if Martin had purchased a golf cart specifically for the tournament, before writing requests to PGA, and showed up and explained he needed the cart, and although he was told he was talented at golfing by PGA reps, PGA never invited him back and left him in the dark and he spent the next several months trying to get reconsideration and trying to explain to PGA that he went through a lot of effort buying his cart for the tournament? What if the question at the heart of the case of PGA shifted from: "can the walking rule be excepted to allow carts, per the ADA?" to "is it discrimination under the ADA for a PGA rep to overlook that Martin invested in his cart to help him compete and not return his requests for modification to join the competition?" Of course. Respectfully, there is no reason this Court should find otherwise with the present case.

## 1.   Plaintiff Has a Disability that the ADA Covers

The term "disability" means, with respect to an individual – a physical or mental impairment — "that substantially limits one or more major life activities of such individual. " *42 U.S.C. § 12102(1)(A)*. "For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, **eating**, sleeping, walking, standing, lifting, bending, **speaking**, breathing, learning, reading, concentrating, thinking, **communicating**, and working." Id. *§ 12102(2)(A).*

Per the above cited statute, Greer has a disability because it substantially limits his speaking, eating and being in public. The official term for his disability is "moebious syndrome". Essentially, Greer's 7th cranial facial nerves are paralyzed and so he can't close his mouth, which makes his communication slurred and makes being out in public difficult because strangers stare at him like he's a circus exhibit. Additionally, eating is hard, as is swallowing. The paralysis also affects his eyes and he can't move them sideways. He also can't smile. His face is essentially frozen in a droopy, open position. He often drools, which he can't help. He slurps when he talks.

There is no argument that his disability doesn't put him at a disadvantage with expression and communication. *Moebious Syndrome Foundation.* (2021). ([https://moebiussyndrome.org/who-we-are/mission-and-history/](https://moebiussyndrome.org/who-we-are/mission-and-history/)).

Therefore, Greer has a disability, per the ADA, that put him at a disadvantage with auditioning.

### 2.   Defendants Maintain a Private Entity & a Public Accommodation

Fremantle and Marathon are places of public accommodation within the meaning of Title III because Defendants operate a "place of exhibition or entertainment". 42 U.S.C. § 12181(7)(C). *Rendon v. Valleycrest Productions, Ltd.*, 294 F.3d 1279 (11th Cir. 2002). Even though the audition was not done at a physical location that Fremantle owns or leases or operates, the Zoom session created a nexus to the physical public accommodation and its privileges that are at the heart of the case. *Id. National Federation of the Blind v. Target Corp,* 452 F. Supp. 2d (2006). ("Courts have held that a plaintiff must allege that there is a "nexus" between the challenged service and the place of public accommodation.").

Therefore, Defendants qualify as a public accommodation.

### 3.   Defendants Employed a Discriminatory Practice

As Greer stated in his Second Amended Complaint, his contention lies with the discriminatory actions and practices of the producers for not following established anti-discrimination policies, previously created with the Department of Justice, and that were apparently in existence as a broad company policy. (Doc 4, Paragraphs 79-85). Said policies stated that Defendant production companies would allow disabled contestants equal access and equal participation and equal opportunities. The producers discriminatory practice in this instance was overlooking the accommodations Greer put in with this audition and not affording Greer equal opportunities to the privileges and advantages that AGT was offering.

The rejection had a disparate impact on him because unlike other contestants who were rejected (or selected), Greer had to put in extra effort to even be on equal footing. Greer's modification request letter, written by the attorney, even argues disparate impact[1]. This disparate impact is even backed up by *Martin,* which uses disparate impact language. "The other golfers have to endure the psychological stress of competition as part of their fatigue; Martin has the same stress plus the added stress of pain and risk of serious injury. As he put it, he would gladly trade the cart for a good leg. To perceive that the cart puts him—with his condition—at a competitive advantage is a gross distortion of reality." PGA v. Martin, 532, US 661 (2001). The pain Greer suffers from coping with his disability and a rejection is "undeniably greater than the fatigue his able-bodied competitors endure from walking the course." *Id*., at 1251.

As stated in paragraph 90 of Doc 4: what good is it that disabled contestants can go to preliminary auditions, but few ever advance? That seems to be a very narrow view of participation for Defendants to allow only preliminary participation. Sure, Defendants can point to a handful of disabled contestants who have been on their show, the last 16 seasons of AGT, but, "The fact that [a company] employs fifteen epileptics is not necessarily probative of whether he or she has discriminated against a blind person." *Prewitt v. United States Postal Service* (5th Cir. 1981). Most importantly, those contestants, although disabled in their own way, could still communicate clearly, which is what Greer's disability limits: communication and what is essential for a show like AGT.

When Greer wrote that he had a disability on the informational forms he was given to fill out at the audition and when he wrote that his act was to accommodate his disability, that should have triggered a deeper analysis by the producers of ensuring that their policies for disabled people to go on the show and participate were met. That should have tipped them off that his act was not a regular act, but rather that of a disabled person and strived to ensure he had equal

---

[1] The attorney referred to it as "indirect discrimination" on page 13 of the Second Amended Complaint.

opportunities to compete in front of the celebrity judges. This is a similar concept to employment law cases where employers are required to conduct a deeper analysis for an applicant with a disability. "Employer bears responsibility for the 'breakdown' in the interactive process." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir.1996). (Plaintiff triggered the interactive process when he informed Edison of his need for an adjustment by indicating that he was hard of hearing on his application.) *Id*.

Nothing said by Defendants indicated that they knew his efforts were to put him on equal footing. If they did know and ignored it, again, it went against their policy of providing equal opportunities for disabled contestants. It's useless to have stated anti-discrimination policies and not implement them. ("It is well established that it is insufficient for an employer simply to have in place anti-discrimination policies; it must also implement them." *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 517 (9th Cir.2000)). How is not following this policy any different than a company that says it will hire more women or more racial minorities and doesn't or companies that deprive minorities of opportunities? *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743-44 (7th Cir. 1999) (holding that it's unlawful to deprive employment opportunities by limiting, segregating, or classifying employees because of race). Looking to race cases for ADA claims is helpful because the ADA "echoes and expressly refers to Title VII, and because the two statutes have the same purpose. Courts confronted with ADA claims have also frequently turned to precedent under Title VII." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001).

To further prove a discriminatory practice, AGT's network, NBCUniversal, has stated in May 2021 that it will strive to bring on more disabled contestants. *NBCUniversal vows auditions for actors with disabilities.* AP News. (2021). ([https://apnews.com/article/technology-entertainment-a94d133c11d45d048970816f92e1667b](https://apnews.com/article/technology-entertainment-a94d133c11d45d048970816f92e1667b)). NBC's Executive VP has stated, "The company is committed to creating content that authentically reflects the world we live in, and

increasing opportunities for those with disabilities is an integral part of that." The producers for Marathon and Fremantle went against their own network's strive for inclusion and denied Greer an opportunity when he clearly showed he had a good and unique act.

By not following policies of affording opportunities to disabled contestants, per their policy, the producers indirectly discriminated against Greer and it had a disparate impact, as shown. Therefore, Greer has shown a discriminatory practice.

### 4. Defendants Failed to Make a Reasonable Modification that Was Necessary

The statutory text of § *12182(b)(2)(A)(ii)* contemplates three distinct inquiries for determining whether a requested modification to a public accommodation's procedures is required: (1) whether the requested modification is "reasonable"; (2) whether the requested modification is "necessary" for the disabled individual; and (3) whether the requested modification would "fundamentally alter the nature" of the public accommodation. *A.L.* , 900 F.3d at 1293 (quoting *Martin* , 532 U.S. at 683 n.38, 121 S.Ct. at 1893 ).

As stated in Greer's complaint, the requested modification that Greer wanted, that Fremantle ignored, was to be let onto the celebrity audition round of the show without preliminary auditioning again. The modification was reasonable, necessary and it wouldn't create an unfair advantage.

### I. Modification Is Necessary

To show whether a modification is necessary, "[p]ublic accommodations must start by considering how their facilities are used by nondisabled guests and then take reasonable steps to provide disabled guests with a like experience comparable to that of nondisabled patrons." *Baughman v. Walt Disney World Co* ., 685 F.3d 1131 (9th Cir. 2012).

This holding fits right in with Greer's complaint because Defendants did not consider that disabled contestants may have to use extra accommodations to audition; that a contestant with a

facial disability, who has to invest in musical accommodations to help him, isn't the same as a band that's been together for years. Reasonable steps would have been Defendants seeing how Greer used his band as an accommodation for him to audition and seeing that he actually had talent for him to proceed onto the celebrity audition round. But that scenario has long past and that is why Greer approached Fremantle with a modification request when his attorney wrote them a letter of April 2021 and it went unanswered..

The modification was necessary because the accommodations he put forth would have allowed him to compete on the show with "equal footing" and so the modification to the policy to allow Greer to proceed to the celebrity audition round would be necessary to allow Greer equal participation and opportunities at obtaining the privileges and advantages that Defendants was offering, per their policies. As stated, a preliminary audition seems to be a very narrow view of equal opportunities and equal participation. This modification was necessary because it would be redundant to make Greer gather his accommodations and audition once again without any assurance that he can proceed on the show. The modification would be necessary because he isn't in the same financial position to audition again. As stated, an injunction would give assurance to Greer's accommodations that he can go on the show for them to help him.

While letting some disabled contestants advance onto the celebrity audition round may seem preferential, the 9th Circuit has addressed this concern. For example, unlike non-disabled patrons, disabled individuals are permitted to bring service animals into public accommodations. Such concessions, while certainly "preferential" in the sense that they confer upon disabled patrons a benefit denied to others, are not only contemplated by the ADA, they are required. *Fortyune* v. American Multi-Cinema, Inc., 364 F.3d 1075 (9th Cir. 2004). Or in the case of *Fortyune*, when a disabled patron sued AMC's policy to sit next to his companion. While every movie theater attendee knows that not sitting next to your spouse or partner is bound to happen, the relief the patron sought was necessary.

The relief Plaintiff sought was necessary as well. There has been a historic exclusion of disabled people from places of public accommodation and places of participation and based on the effort he put in as a disabled songwriter and the fact that Defendants have stated they will provide opportunities for disabled contestants, it was necessary to let him advance to the audition round in front of the judges. To not do so, just like not letting a disabled person sit next to their companion in a theater seat or letting a disabled person have a service animal in a store or not letting a disabled golfer use a golf cart, was a discriminatory practice by the producers of AGT.

Further, the modification was necessary because as stated, opportunities for disabled contestants are rare. Whereas an able-bodied contestant can have unlimited try outs and auditions by trying out for various shows, having a facial paralysis limits Greer's opportunities. As stated in the complaint, AGT was probably the only musical show Greer could use his accommodation because most other shows are single contestants and not groups. If other shows existed that were similar to AGT, Greer admits he would try out for those shows. But AGT has the market for group talent shows. Without a modification allowing Greer to compete on the show with his accommodations, Greer would be denied the privileges of auditioning on any reality show.

The ADA's implementing regulations are designed "to place those with disabilities on an equal footing, not to give them an unfair advantage." *Kornblau v. Dade County*, 86 F.3d 193, 194 (11th Cir. 1996). See also *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 681 (5th Cir. 1996) (noting that "an employer who treats a disabled employee the same as a non-disabled employee may violate the ADA"). That is precisely what Greer's injunction accomplishes. Because Greer's sought-after remedy merely gives force to a reasonable accommodation, any protestation that the injunction is unduly preferential would fail as a matter of law.

2.        **Modification Is Reasonable**

Reasonableness is generally a fact-specific inquiry, asking whether the specific modification is "reasonable under the circumstances." *Martin* , 532 U.S. at 688, 121 S.Ct. 1879.

A modification is reasonable if it is reasonable on its face, i.e., "ordinarily or in the run of cases."

*J.D. ex rel. Doherty v. Colonial Williamsburg Foundation* , 925 F.3d 663, 674 (4th Cir. 2019).

   The modification was reasonable because Greer was only asking for the modification to be applied as to him, on a case-by-case basis, and not generally to all disabled people who audition. The statute even allows for modifications for "individuals with disabilities" and not for all people or for class actions. This is backed up by *Martin,* which pointed to the lack of lawsuits asking for carts on the fields. Further, the *Martin* court states: "nowhere in *§ 12182(b)(2)(A)(ii)* does Congress limit the reasonable modification requirement only to requests that are easy to evaluate." *Id* at footnote 53.

Since Fremantle made the agreement with the DOJ in 2011, there have been zero lawsuits filed by disabled contestants suing for modifications for contestants to be placed on Defendants shows. It is unlikely and highly doubtful that granting this modification will open a flood gate of litigation. If that were true, lawsuits would have been filed after the 2011 agreement.

The modification request would be reasonable because groups frequently audition on the show. Contrast this case with Murphy, where a skier's modification to have her husband accompany her was not necessary to provide her with equal enjoyment. Murphy v. Bridger Bowl , 150 F. App'x 661, 663 (9th Cir. Oct. 5, 2005) (holding that cognitively-disabled skier's requested modification for ski resort to allow her husband to accompany her on a ski bike was not "necessary" to provide her with full and equal enjoyment of facility). See also Logan v. Am. Contract Bridge League, 173 Fed.Appx. 113, 117 (3d Cir.2006) (citing *Martin* and stating that "Logan admits that the Logan Deck is not necessary to give him access to ACBL competitive bridge; he merely claims that without it, he `can't play to the maximum of [his] potential.' ... Logan has failed to set forth a meritorious claim"). Both cases differ from Greer's because the modification is necessary and reasonable for Greer to convey his talent as a songwriter, and without his modification, he cannot compete on the show, as a modification request would assure

his accommodations they can help him without thinking their time will be wasted, where both cases could still compete by themselves or with a regular deck of cards.

Further, it's reasonable to allow Greer's modification request, as he clearly had talent, clearly showed effort and had an awesome story to boot. While each disabled person may feel their story and hardship warrants a modification exception to go on the show, each request should be analyzed on a case by case basis. His efforts are clearly distinguishable from an individual with a disability who auditions by himself, in a dark room and one can clearly tell there is no effort on the auditioner's part. As *Martin* states: requests should be made on an individualized basis. "Martin's claim thus differs from one that might be asserted by players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity. In such cases, an accommodation might be reasonable but not necessary." *Id* at 682.

 Greer has shown why his modification is both reasonable and necessary.

### 3.   **Modification Would Not Create an Unfair Advantage**

 Title III of the ADA "requires without exception that any policies, practices, or procedures of a public accommodation be reasonably modified for disabled individuals as necessary to afford access unless doing so would fundamentally alter what is offered." *Martin* , 532 U.S. at 688, 121 S.Ct. at 1896. The defendant operator of the facility or public accommodation bears the burden of proof on the "fundamental alteration" inquiry. A "fundamental alteration" is a "modification to an essential aspect of a public accommodation's program." *Halpern v. Wake Forest Univ. Health Scis* ., 669 F.3d 454, 464 (4th Cir. 2012).

The only possible fundamental alteration argument Fremantle could possibly raise is Greer being allowed to bypass the cattle call audition. But as stated in Greer's Second Amended Complaint, on page 22, footnote 6, couldn't it be argued that Defendants' producers themselves are fundamentally altering the competition by allowing acts to bypass the preliminary auditions? By them allowing acts to bypass preliminary auditions, that fact alone belies the notion that

14

preliminary auditioning is an essential element of the show. See DOJ's Amicus Brief in support of *Martin*. (https://www.justice.gov/crt/martin-v-pga-tour-inc). (Says: "Moreover, the PGA itself permits competitors to use carts in some of its tournaments, including the senior tournaments and the early rounds of the qualifying tournament. ***That fact alone belies t***he notion that walking is an essential element of competitive golf.").

It is common knowledge that Fremantle's producers frequently bring contestants on without preliminary auditioning. Season 2 AGT country singer Julienne Irwin told Radar Online: "When I made it to the Top 20, I couldn't believe I was the only one that really came from an open call audition. I was the only one that hadn't been a professional performer." *Proof America's Got Talent is Totally Fake.* (2017).*(* https://www.nickiswift.com/28827/reasons-americas-got-talent-totally-fake/?utm_campaign=clip). In a book titled, '*Inside AGT: The Untold Stories of America's Got Talent'* (2013), many of the show's former contestants claimed that contestants were recruited before the start of the show's much-touted audition season. Thus, although the show tries to give audiences the impression that it holds open and fair auditions, in reality, even the contestant selection process is predetermined. https://thecinemaholic.com/americas-got-talent-real-or-scripted/. Not only are some contestants recruited from YouTube and comedy clubs, but they are sometimes cross over from the other international  branches of the show. For example, the act, Sacred Riana was in Season 2 of Asia's Got Talent and recently appeared on Season 13 of America's Got Talent. *Id.*

Further proof that a modification bypassing the preliminary audition would not fundamentally alter the show is that Fremantle has already made agreements that it would allow modifications and exceptions to allow disabled people to become contestants on their shows, e.g. TPIR. The Price is Right (TPIR). Settlement Agreement Under the ADA Between USA, Fremantle and CBS. ADA.gov (2011). (https://www.ada.gov/price-is-right.htm). With Fremantle agreeing that it would allow contestants to make exceptions to go on one of their shows to

compete, there is no fundamental reason or no fundamental alteration that that policy can't be applied equally to Fremantle's other shows. Since Marathon is a subsidiary, they would follow said policies. Further, the show's network NBC has said they would strive for more disabled people.

The Supreme Court held in *Martin* that the use of carts, or waiver of the "walking rule," was not inconsistent with the "fundamental character" or "essential attribute" of the game of golf which was "shotmaking—using clubs to cause a ball to progress" to a "hole some distance away with as few strokes as possible" based on historical references to the rules of golf dating back centuries, none of which referenced motorized carts until the 1950s as a means of speeding up play and generating revenue. Id. at 683-85, 532 U.S. at 683, 121 S.Ct. at 1893-95. In addition, the Supreme Court rejected the defendant-tournament's "outcome affecting" argument because there was a lack of evidence that the "walking rule" caused more fatigue for the average pro player in a tournament, with rests and refreshments, than for plaintiff Martin, who "endure[d] greater fatigue even with a cart." Id. at 686-88, 532 U.S. at 687, 690, 121 S.Ct. at 1895-97.

Likewise, the modification Greer is seeking is not inconsistent with the policies and agreements Fremantle has previously established. These policies have established a "fundamental character" that Fremantle understands the plights of disabled contestants and is open to making exceptions and modifications. A modification to go onto the celebrity audition round of the show, without having to go through the preliminary audition again, is completely in line with these previously agreed upon policies.

Further, there is no "outcome affecting" concerns because Greer would be starting at the same audition spot as every other contestant brought onto the show, whether those contestants are recruited by Defendants or selected at the cattle call audition. There is no outcome affecting concern because the celebrity round is essentially a second audition. The judges buzz off those acts they don't like and allow the acts they do like to proceed onto the other rounds of the show.

16

It's not giving Greer a head start or an unfair advantage because he would be starting at the same position as every other contestant. Greer would still be allowed to be buzzed off and still be allowed to abide by any other rule the other contestants have to follow.

As stated previously in points 1 & 2, allowing Greer onto the celebrity audition round would be giving Greer a chance to compete for the show's privileges and advantages, in accordance to Defendants' policies. With it being shown that the modification is necessary, the modification is reasonable and that there is no fundamental alteration, Greer has successfully shown he has satisfied a Title III discrimination claim.

## 2.      Plaintiff will Suffer Irreparable Harm if the Injunction is Not Granted.

Irreparable harm may be presumed when the offending party engages in acts or practices prohibited by federal statute that provides for injunctive relief. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Smallwood v. National Can Co*., 583 F.2d 419, 420 (9th Cir. 1978) ("[T]his is an injunction issued in response to a statutory provision, and irreparable harm is presumed from the fact of the violation of the Act."). The ADA explicitly provides for injunctive relief. *42 U.S.C. § 12188(a)*. (ADA incorporates the remedies and procedures set forth in the Civil Rights Act of 1964).

Furthermore, Plaintiff can demonstrate that he has and will continue to suffer irreparable harm. As was the case with the plaintiff in *Enyart v. National Conference of Bar Examiners*, in the absence of a preliminary injunction, he would "lose the time [he] had invested in preparation, [would] suffer a serious setback in [his] efforts to practice [his] chosen profession, [would] face the prospect of taking and preparing for the exam a third time, and [would] suffer the professional stigma of failure because of [his] medical disability." *Enyart v. National Conference,* 630 F.3d 1153 (9th Cir. 2011)

Likewise, Plaintiff Greer would lose the money and time he invested in his audition and the accommodations he hired to help him. Greer would suffer a serious setback in his efforts to get

into his desired profession of the entertainment industry. Greer would face the prospect of preliminary auditioning again with no guarantee of going onto the show. Lastly, Greer would suffer stigma of failure because of his disability. Of knowing his accommodations he put in weren't enough to get him onto AGT.

**3.    The Equities Weigh Heavily in Favor of Granting the Requested Relief.**

 The harm an injunction would cause Defendants is non-existent. As shown, no previous people have sued Defendants to go on their shows. Defendants have already formed an agreement with the DOJ that it would seek to have more disabled contestants on their shows. There is no cost of allowing Greer on the show as compared to a non-disabled contestant. In fact, Defendants are putting up more money fighting this lawsuit than any money that would go towards allowing a modification. So Defendants suffers no harm and thus the equities weigh in favor of Plaintiff.

**4.    Granting the Preliminary Injunction Will Advance the Public Interest.**

Congress has made clear in enacting the ADA that the public interest lies in the eradication of discrimination against persons with disabilities, declaring that the ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004). In the context of preliminary injunctions, courts have found that "[t]he public interest is clearly served by eliminating the discrimination Congress sought to prevent in passing the ADA."  *See* 42 U.S.C. § 12101.

Furthermore, the ADA is intended to address the various forms of discrimination encountered by individuals with disabilities, including "the failure to make modifications to existing facilities, policies and practices". Accordingly, granting the injunctive relief requested by Greer is consistent with the anti-discrimination mandate of the ADA and therefore serves the public interest.

Finally, although Greer is not challenging the speech or casting of AGT, only their failure to make a modification, it is still important to bring up that diversity on television is a compelling public interest. Since reality TV is a reflection of what the American viewership perceives to be reality, granting the injunction will advance the public interest of having diversity on television and will show the American public that people with facial deformities have talent. People "use television to acquire values, beliefs, concepts, attitudes, and basic socialization patterns," which means that negative stereotypes about…minorities or the simple exclusion of said minorities from depictions of "normal" life on television can harm "minorities' self-concept." Brigitte Vittrup & George W. Holden, *Exploring the Impact of Education TV and Parent-Child Discussions on Children's Racial Attitudes,* 11 ANALYSES Soc. IsSUES & PUB. POL'Y 82, 85 (2011). NBC and Defendants seem to agree with this public interest, given their prior established policies.

**B. Plaintiff Should Not Be Required to Post a Bond.**

This Court has the discretion to issue a preliminary injunction without requiring Plaintiff to post bond. Plaintiff respectfully submits that no bond should be required in this case, given his individual situation and the minimal expense (if any) that would be incurred by the Defendants pending the outcome of this case.

**Conclusion**

Plaintiff concludes that he has shown that he has met all four standards for a preliminary injunction. He has shown that the public has an interest in this injunction. He has shown he will suffer greater harm than Defendants.

For the foregoing reasons, Greer respectfully requests that the Court grant his Motion for Preliminary Injunction, which enjoins Fremantle to allow Russell Greer on the 17th Season of AGT to audition in front of the celebrity judges, which said filming starts in April 2022.

Respectfully

DATED:  January 28th, 2022

Respectfully submitted,

By:

Russell Greer

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing AMENDED PRELIMINARY INJUNCTION with the Clerk of the Court by using email.

I certify that the following participants in this case are registered electronic filing systems users and will be served electronically.

Served are:

Joel Schwarz: joel@h1lawgroup.com

Molly Lens: mlens@omm.com

Zachary Dekel: zdekel@omm.com

Counsel for Fremantle and Marathon.