# EXHIBIT H
# Complaint, *Greer v. Swift*, Case No. 3:18-CV-00394 (M.D. Tenn.)

J063

Russell Greer



West Valley City, Utah 84119

Pro Se Litigant



FILED
2018 APR 25 PM 1: 06
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

---

## IN THE UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

---

| | |
|---|---|
| **RUSSELL G. GREER,**<br><br>    Plaintiff<br><br>v.<br><br>**TAYLOR A. SWIFT,**<br><br>    Defendant | **COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES, AND FOR PRELIMINARY INJUNCTIVE RELIEF**<br><br>Case No.:<br><br><br>Judge<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Russell G. Greer comes forward now with his Complaint against the Defendant named above and alleges as follows:

## NATURE OF THE ACTION

1.      In a world where safeguards and disclaimers are put into place at every turn for consumers and those wishing to do business with others, there are surprisingly no safeguards or disclaimers utilized by world famous celebrities, whose influences can be felt internationally, to minimize or avoid potential damages. Defendant Taylor Swift happens to have such an influence, which has resulted in a nearly two yearlong harm to Plaintiff and has given rise to this cause of action.

2.      Since the inception of the American judicial system, courts and legal scholars have held and argued that those who create misrepresentations, can be held liable for harm suffered by third parties. Misrepresentations can be more than words – they can include "conduct not in accordance with the truth", with no privity of contract required. *RESTATEMENT (SECOND) of TORTS §525.* (1977).

3.      Celebrities and public figures can already be held liable by the *Federal Trade Commission* (hereby collectively referred to as the "*FTC*"), per *15 U.S. Code §41-57,* for negligent endorsements and for failures to warn, in regards to the endorsement of products, though, only the *FTC* can bring action against celebrity endorsers in regards to products. However, there are no restrictions precluding a private party to cite and use said federal statute as persuasive authority for actions not based on the statute, per se.

4.      Further, it is grounded in federal case law and is well settled that those in public and higher statuses are held to a higher duty of care and whose actions are more scrutinized than a regular person's conduct.

5.      This is a civil action seeking monetary damages for the negligent actions of Defendant

Taylor Alison Swift (hereby collectively referred to as "Swift" and/or "Defendant") for her

failure and breach of duty to use disclaimers in connection to her publicity stunts and intellectual

property, of which have resulted in monetary damages, emotional damages, economical damages

and physical damages to Plaintiff Russell G. Greer (hereby collectively referred to as "Greer"

and/or "Plaintiff"), as he relied on Swift's publicity stunts and her intellectual property.

6.      In addition, given the harm Swift has already inflicted, and is continuing to inflict, upon

Greer, a preliminary injunction is requested upon Defendant Taylor Swift, as her *Reputation*

concert tour begins May 8th, 2018. In her advertised package prizes and social media content,

there are no disclaimers, nor any safeguards mentioned at all, in any of her social media posts.

These posts continue to inflict emotional harm upon Plaintiff Greer and could easily result in

harm to the millions of consumers who rely upon Swift's social media content. An injunction is

asked to be placed to halt Swift's concerts from moving forward until the resolution of this case

to determine whether Swift owed a duty to warn to Greer and if that duty to warn needs to be

implemented currently and in the future.

## JURISDICTION

7.      The jurisdiction of this Court is based upon 28 U.S.C. § 1332, as there is complete

diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00,

exclusive of interest and costs.

## PERSONAL JURISDICTION AND VENUE

8.      Personal jurisdiction over Defendant is proper in this Court on the grounds that:

(a) Defendant transacts substantial business in the State of Tennessee; (b) Defendant owns two

homes within the State and within this Court's jurisdiction, to which she regularly lives in; (c)

Defendant's management companies (13 Management and Taylor Nation) are incorporated

within the District and (d) Defendant's record label is in the District, which Defendant has substantial shares in and is actively involved in conducting business with.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## PARTIES

10.     Plaintiff Russell G. Greer resides in the State of Utah. He is 27 years old and has his paralegal degree. He was born with a facial disability termed, "*Moebious Syndrome*", which means that he can't close his mouth and talk clearly, thus making daily life activities such as communicating, eating, drinking and being in public difficult.

11.     Defendant Taylor Swift is an internationally famous, award winning artist who is a year and a half older than Russell Greer. Swift is celebrated by the media for being supposedly compassionate and open with fans.

## GENERAL ALLEGATIONS

12.     Taylor Swift entered the mainstream music scene in 2008, starting off as a country music artist. Her music was widely listened to in Greer's hometown of Evanston, Wyoming.

13.     Greer's sister introduced Plaintiff to Defendant's music in 2009, after Greer had been arrested for a high school prank.

14.     While being held in jail for said prank (he was only in jail for two weeks), Greer became more familiar with Swift's music, as Swift's music videos and music were featured on the jail T.V. and the exercise room radio.

15.     Greer was released from jail on a judge's order in December 2009. Three months later, the charges against Greer were dropped.

16.      For Greer's Christmas present of that year, he was given an IPod Touch. With music gift cards, Greer purchased Swift's music. Swift's song, "*15*" helped get Greer through his hardest times, as the song was about self-discovery.

17.     By purchasing Swift's music, Greer became more than a fan, he became a consumer of Swift's business, which is her music.

18.     Greer began to follow Swift, via her social media (Facebook, Twitter, Instagram, as a fan). On each of Swift's social media platforms, she has over 50 million followers. Instagram contains her highest number of followers, which consists of 106 million profiles that follow her.

19.     Through Swift's social media postings, it became commonplace for her to post and showcase gifts sent to her from fans and the consumers who spent considerable amounts of money for her attention. Some gifts were impressively knitted quilts, while others were cheap Subway gift cards. Regardless of price, these acceptances and showcasing of gifts created representations that Swift was open to receiving and acknowledging those who reached out to her.

20.     From 2010-2016, Swift's publicity stunts went far beyond showcasing gifts. Swift accepted prom invites from high school boys and made news headlines with it; she openly "crashed" parties and accepted weddings invites and posted them onto her social media. For the promotion of a movie that Swift had written a song for, Defendant Swift explained that the film's protagonist's struggles "inspired" her. Defendant's words, actions and postings, all done on her public profile to generate publicity and to advertise, swayed Plaintiff Russell Greer.

21.     Struggling to get into the entertainment industry, due in part to his disability, Greer believed, based on Defendant Swift's posting, that if he invested 100% effort and originality, he could catch Swift's attention and have similar success and acknowledgement.

22.     Starting his quest in 2014, Greer began working on a gift song for Swift. It is important to note that the song was a gift for Swift to have, no different than a quilt, and not a song for her to do. Greer wanted to stand out by writing a gift song for her, which talked about how much her music helped Greer and how Greer connected to Swift. Also, another purpose in creating the

song was that if Swift liked the song, it could hopefully open doors. Based on Swift's past representations, the plan was realistic.

23.    Since Greer has a disability, he never purchased any professional recording equipment or software, as it didn't make much sense to. He also didn't purchase professional equipment due to cost and space considerations in his living situations. All that Greer had to produce his music with was a 6x4 electronic keyboard and a music notation software on his laptop.

24.    With his laptop set up on his desk and his piano positioned on the corner of his desk, Greer would play his piano as he sang aloud, composing his gift song for Taylor, which was entitled, "I Get You, Taylor Swift". Once Greer found what he felt was the right sound, Greer would turn to his laptop and manually enter in each note into his computer program, having to determine which clef the note belonged in and the duration of the note, e.g. a half note, quarter note, 16th note, etc. Plaintiff would transition between piano and computer.

25.    Even though it was a tedious and long process, a process which took Greer nearly two years to accomplish, as he went through several versions and sounds of the song, there was never a doubt in Greer's mind that his efforts would not be welcomed, nor that they wouldn't have the same success as people who did things that did not take any effort to create. In fact, many people told Greer that Swift was a "nice person" who would "love" the song, comments made solely on Swift's misrepresentations.

26.    Greer graduated college in 2015 and was hired on with an intellectual property law firm as a paralegal assistant. One month later, Greer was fired, in part, due to his Taylor Swift efforts. The firm saw his efforts as unprofessional.

27.    Greer's Paralegal Program Director at his alma mater chided Greer for his efforts at wooing Swift and warned Greer that firms would not like his desired aspirations, telling him to choose between being a legal professional or wooing a celebrity. Greer felt he could do both. He truly relied on Swift's representations and publicity stunts.

28.     Greer tried starting an online fundraiser campaign to raise money to produce his song since his job didn't pay enough to where he could afford production. Unfortunately, Greer didn't meet his financial goal. During this time, though, online harassers, commonly known as "internet trolls", began bothering Greer and would leave comments on his efforts, telling Greer that he was "too ugly for Taylor Swift", amongst other horrible, unprovoked comments.

29.     In 2016, Greer was again hired with another intellectual property firm. As soon as he started working at the firm, people using fake emails began harassing Greer's firm manager and began spamming the manager with lies about Greer. There is a reasonable belief to assume that the harassers were the same people leaving derogatory comments on Greer's social media. Plaintiff feels that the trolls were jealous of his ambitions.

30.     In July 2016, Greer finally had enough money to produce the gift song he toiled so long and hard at. During this same month, Taylor Swift had a high profile break up with actor Tom Huddleston.

31.     Believing that her break up was the opportune moment to finally reach out to her, Greer urgently looked to hire a music produce to sing and produce his gift song.

32.     Looking in Utah, Greer found no musicians or recording studios who could read music or who understood Greer's difficulties.

33.     Plaintiff turned to online music studio ads. Greer paid a very talented musician in Nashville to help him produce his song. The musician defrauded Greer and did not produce the song as agreed. This hurt Greer very much.

34.     Plaintiff contacted other studios to hire. Many didn't return his messages, due to what he was trying to accomplish.

35.     Out of desperation, Greer made contact with *Songcat Studios*, a studio in New York City that had many positive reviews, but whose music samples weren't exactly the best. Time was of the essence, though.

36.     Plaintiff hired and paid *Songcat* $400.00 and gave *Songcat* audio samples of the song, sheet music and instructions on how to do the song.

37.     Greer waited two weeks for the gift song to be produced. When the song had finished production, the final product sounded nothing like he had written. The song sounded like a cheaply made children's song, sang by a wannabe Darius Rucker, which is putting it kindly. Understandably, Greer was infuriated.

38.     Friends of Plaintiff encouraged Greer to not reproduce the song or to get mad at the studio. Rather, the friends convinced Greer that the song was good for what it was meant to be: a well-intentioned gift from the heart. Greer agreed and reasoned with himself that his story of trying to overcome a disability and adversity would be what he was mainly trying to give her. Additionally, Greer's sheet music showed effort.

39.     Greer wanted to be professional with his approach and therefore chose to approach Taylor's agents. As Greer prepared to contact the agents of Taylor Swift, Plaintiff posted a video of the song onto his social media, which began with a brief voice over of Greer's brother explaining the efforts Greer had gone to in creating the gift song.

40.     Out of nowhere, the trolls put the song onto Reddit, an online forum, and began harassing Greer by belittling him online.

41.     In July of 2016, Greer made contact with Swift's agents through email, sending them the gift song and told the agents about what he hoped to accomplish with the song.

42.     A few days later, on 7/18/2016, Jay Schaudies, one of Defendant Taylor Swift's head agents, wrote Greer quickly back and said in a way that seemed as if he hadn't really read Greer's message, that "(Swift) writes all of her own music and therefore this message will not be forwarded or opened", completely ignoring the gift song and story that Greer invested so much in, that was invested based on her publicity stunts.

43.     Greer was devastated. Jay was completely negligent to Greer's message. With a broken heart, Greer replied to Jay and explained in the subject line of the email that the song was not a song for Taylor to do, but rather a gift song for her to have. Greer explained the efforts he put in for Taylor. Jay didn't reply.

44.     The Summer of 2016 left Greer with a bitter taste in his mouth, as he had worked so hard for something that could flatter Taylor, but she would never see it because of the incompetence of her agents. During this time, Taylor kept doing publicity stunts and influencing the public, e.g. donating money to hurricane victims in Louisiana and interacting with fans.

45.     When September of 2016 came, Greer mustered up the courage to email Jay again and tried explaining who he was and what he had worked so hard on.

46.     On the 13th of September, Jay called Greer's cell phone. Greer was unable to answer the call, as he was at work. During his lunch break, Greer checked the phone call and saw that Jay had left a voice message on his phone. The voice message reiterated what Jay had told Greer previously in the email of how Swift writes all her own music. Jay explained the contracts that Taylor is in with her record label and publishing company. Jay told Greer that he essentially did not care about his disability or his plight, by saying: "no matter who you are or what your cause is". The most troubling part of the voice message was that Jay still was under the assumption that Greer was sending Swift a song for her to do and not a gift song.

47.     Many people close to Greer saw a change in him. Greer had a piece of him destroyed by Jay. Greer had worked so hard and had invested so much and he was the subject of harassment that he couldn't give up, so he decided that he would go around the agents and try various avenues to get his gift and plight to Taylor: he contacted the president of Big Machine Records, Taylor's record label, to try passing on the gift; he contacted Swift's intellectual property firm; he tried making contact with Swift's immediate family and nothing worked. He even mailed

letters and sent flowers to Swift's parents' home in Hendersonville, TN. He didn't have Swift's personal home addresses at the time. To Greer's bewilderment, nothing worked.

48.     Desperation and depression began to overcome Greer. Being a paralegal, Greer knew that the agents had been extremely negligent. His mind began to trot through his legal education and "vicarious liability" and other legal terms came to his recollection. Greer reasoned to himself, in a desperate way, that the only way he could get Swift's attention was by suing her for the agents' negligence. Under the *Birkner Test* established by the Utah Supreme Court, an employer could be held vicariously liable for the conduct of the employee if: (1) the employee's conduct is of the general kind the employee is hired to perform, (2) the employee's conduct must occur substantially within the hours and ordinary spatial boundaries of the employment and (3) the employee's conduct must be motivated, at least in part, by the purpose of serving the employer's interest. *Christensen v. Swenson*, 874 P. 2d 125 (UT 1994). Since the agents fell under all three prongs, Swift was liable.

49.     Greer wasn't suing Swift to get her in trouble, per se. He was suing her to bring her attention to an unfair situation and to work something out, which is backed up by established law: *The Restatement (Third) of Agency 2.04* (says that suing under vicarious liability "reflects the likelihood" that an employer will work a problem out). Honestly, Greer thought Swift was a great person who would feel compassion for Greer's efforts, based on her publicity stunts. Though Greer's efforts were unconventional, they were backed up by case law and filed in good faith.

50.     Greer filed the suit in small claims court in Utah. He asked for $7,000.00 because the agents did cause that much damage and to also serve as punitive damages. The case was assigned case number 168401024.

51.     Greer recorded a video of himself soon after filing the lawsuit and explained how much Swift meant to him, why he filed the lawsuit and how he hoped his efforts in creating the gift song could be rewarded, with a suggestion of dinner. Greer emailed the video to Swift's agents.

Not satisfied with the video, believing that he had made a few misstatements, Greer recorded a
thirty-minute video to clearly explain everything and emailed it to the agents.

52.     Three weeks later, the counsel that Swift had hired in Salt Lake City, sent Greer a Motion
to Dismiss, which contained a hostile tone. "By and through" her attorney Greg Skordas, Swift
slandered Russell Greer's attentions. Swift referred to Greer as being "invasive" and "troubling",
all because Greer had relied on Swift's representations and because he did not want the effort
and the pain he had gone through to be in vain.

53.     Knowing that Swift hated Greer for him simply relying on her publicity stunts and her
subtle invitations, sent Greer into seizures, depression moods, angry rants on social media, loss
of sleep, development of sicknesses, messing up with work performance, thoughts of suicide to
where Greer had to call crisis hotlines. Greer felt discriminated against and felt dehumanized by
Swift. He felt singled out, as others had written to her and had success.

54.     A small claims trial was held on December 8th, 2016. Greer wasn't able to or allowed to
supplement his complaint, to claim anything against Swift directly, as small claims procedures in
Utah do not allow it, nor is there one judge assigned to a case who oversees a docket. Greer
solely argued vicarious liability and why Swift should be liable for the agents' mishandling of
the gift song. The judicial process in small claims court in Utah is actually compromised of a
multiple variety of pro tempore judges, who are full-time lawyers that volunteer, after having
been appointed by the Utah Supreme Court, as a judge on the side. It is not known who the judge
is until the "trial".

55.     Greer ended up losing at trial due to a hostile judge; not being able to present evidence;
not being able to introduce new claims, as small claims court in Utah doesn't allow supplemental
complaints or additional arguments, and for lack of jurisdiction. At the small claims trial, Greer
only argued vicarious liability, as that is what was in his complaint, and because he was unable
to raise new claims against Swift, per the *Utah Code,* and was unsure if he could raise claims

even if he could. All of the allegations against Swift in his complaint only consisted on vicarious liability matters and negligence on behalf of her agents, never for anything she did directly, as previously stated, he was initially trying to bring her attention to a wrong situation. *Greer v. Swift*. Salt Lake City Small Claims Court. Case Number 168401024.

56.     Those in attendance agreed with Greer that the judge was hostile towards Greer, nor was Greer able to say anything fully or was able to. Several news outlets picked up the story, spanning across the globe internationally, making Greer look deranged. The outlets omitted key words like "vicarious liability" and failed to mention that Greer had a disability. Further, the outlets seemed oblivious to the fact that it was a gift song he had created and not a song for Swift to have. This carelessness of information was illustrated at the trial when Swift's lawyer Greg Skordas made the comment that Greer could have sent his music elsewhere, when in reality, no Greer couldn't have because the song was about Taylor Swift, thus it truly was a gift song, no different than a quilt a fan made for Swift, regardless if the gift was music.

57.     Internet trolls picked up Greer's story and began creating false accusations against him on numerous troll sites, completely ruining his reputation.

58.     The trolls went from simply writing online libel about him to harassing Greer's places of employment, harassing Greer's family, posting Greer's private information, electronically harassing and stalking Greer, posting pictures of Greer, filming Greer when he wasn't looking, impersonating Greer; doing other insane and criminal things against him.

59.     The harassment extended to real life too with people accosting him in public, shouting at him for being the guy who "stalked" and sued Taylor Swift, and other ridiculous allegations and slander, which caused embarrassment and shame to plaintiff. Greer was also followed in cars and filmed by random strangers and threatened. On one occasion, a small group of people, acting like a sort of lynch mob, followed Greer down a sidewalk, yelling obscenities at him. Greer feels like he has a bullseye on his back.

60.     Greer tried fighting the slander about him by self-publishing a book through Amazon, entitled, "*Why I Sued Taylor Swift and How I Became Falsely Known as Frivolous, Litigious and Crazy*". Amazon.com. ISBN 978-0-692-97010-2. (2017). The book only brought upon Greer more harassment.

61.     The intellectual property firm that Greer had worked at for over a year and half, *Patent Law Works*, finally fired him in October of 2017, due to the incident and claiming that he wasn't a "good fit", which was bizarre to claim after being employed for so long.

62.     Two weeks after Greer's termination from the firm, Greer was offered a paralegal job with a debt collection law firm in the end of October 2017. After two days of employment, the head lawyer called Greer and mentioned to Greer how he, the head lawyer, had discovered Greer's small claims lawsuit against Taylor Swift and made a wild accusation, believing that based on everything, Greer would mishandle client information, so the lawyer fired Greer.

63.     Greer ended up working an industrial job cleaning firefighter uniforms with *ECMS, Inc.* for a few months. The job was horrible, but Greer needed income. The manager, Troy, called Greer in, on the 12th of February 2018, and randomly fired him, citing unspecified concerns, which is inferred to have had to do with Taylor Swift. Greer told the manager that he quit before being fired. It is unknown what the manager put Greer's final discharge status as.

64.     A week later, in February of 2018, Greer was hired on with a warehouse, *EReplacementParts.com*, sorting boxes. Greer felt he was doing good until two days later, the managers, Eric and Jake, called Greer into the office and terminated him; they claimed it had to do with him making mistakes, but they had very concerned looks on their faces and had expressions that conveyed that they wanted to say more, but were leery of talking about it, as if the termination involved something else, i.e. Taylor Swift. This is a reasonable presumption based on previous employers firing Greer because of the Swift incident.

65.     In a span of 6 months, four jobs fired Greer — all because of Taylor Swift and the
Pandora's box that was opened on him for relying on her publicity and for fighting for the efforts
he had worked hard on. Greer has had to receive State unemployment checks to survive.

66.     At the time of this writing, Greer is currently employed as a maintenance worker where
he is discriminated against by management and customers who are all unaware of Greer's
professional background. The management talks down to Greer because of his disability. Greer
has fallen to an all time low. Menial office jobs refuse to hire Greer because of all the slander
and misunderstood actions surrounding him, which have stemmed from Taylor Swift and her
slander against Greer. The actions of Swift and her failure to act, fall classically within the "But
For" test, as will be covered in the Claims section. Needless to say, Swift's actions and inactions
have directly caused a ripple effect of bad events that have ruined plaintiff's life and have
resulted in physical, emotional, monetary and economical harm and loss.

67.     As will be briefly shown in the next paragraph, *res judicata* (issue preclusion) does not
bar Plaintiff from filing this case.

## RES JUDICATA DOES NOT APPLY

68.     *Res judicata* bars litigants from relitigating issues that were or could have been raised in
that action. *Commissioner v. Sunnen,* 333 U.S. 591, 597 (1948). But as was previously
established, the rules of Utah Small Claims Court do not allow for supplemental complaints, nor
is there a direct judge to oversee a docket, as the rules have been "simplified" to dispense
"speedy justice". *Utah Code 78A-8-102(8); 78A-8-104(1).*

69.     Further, this Complaint is not relitigating previously argued issues, as the Small Claims
matter only argued "vicarious liability" and the negligence surrounding proper management.
*Greer v. Swift* (Salt Lake City Small Claims 2016). The small claims case was filed blaming the
conduct of the agents, hoping Swift would notice. In fact, it alleged no wrongs by Swift, as Greer
didn't think Swift was aware. Swift's counsel in that case even wrote in the Motion to Dismiss

that Greer claimed no harm caused by Swift. On the contrary, this Complaint is alleging a breach

of a duty to warn on behalf of Swift, claims which have arisen from events in the last 6 months.

70.      Also important, *res judicata* does not apply when the trial and judgements have been

found to have been unfair or biased. As stated in the facts, the judge did not allow Greer to

present evidence; the judge was hostile to Greer, no new claims could or would have been

allowed to be introduced and everything else claimed in Paragraph 61. Lastly, with the degree of

harm Plaintiff has suffered and the importance of the factual and legal questions surrounding this

Complaint, this case should not only be heard and considered, but given to a jury for trial.

## COUNT I

### Failure to Warn

71.      Russell Greer realleges each and every allegation in paragraphs 1 through 70 as if fully

set forth herein. Further, all claims set forth are derived from previous tort law framework.

72.      Long standing case law holds that in certain "circumstances" and with higher

responsibility, based upon the risk of harm, there is a duty to warn. *Marine Terminals v.*

*Burnside Shipping Co.,* 394 U.S. 404, 415 (1969) (holding that there is a duty of care "under the

circumstances"). Several persuasive factors must be presented to establish this duty.

73.      Swift, as a public figure and an internationally, famous celebrity, has a right to publicity,

which allows her to sway, entice, captivate, promote and make a profit off of her name, image

and works. *Memphis Development Foundation v. Factors Etc., Inc.,* 616 F.2d 956 (6th Cir. 1980)

(holding that "the famous have an exclusive legal right during life to control and profit from the

commercial use of their name and personality". *Id.* at 958). Similarly, Swift has exclusive control

over her intellectual property. *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831 (6th

Cir. 1983) (holding that a celebrity has a protected pecuniary interest in the exploitation of his

identity. *Id.* at 835).

74.     As a property owner, though, Swift's rights do not go unchecked. Property owners who own real property are liable for failing to warn of "hidden or latent dangers" to invitees, licensees and trespassers. *Blair v. Campbell,* 924 S.W.2d 75 (TN 1996). This preexisting property law can extend to intellectual property owners. *Memphis Development,* which the 6th Circuit reviewed a case of the right of publicity of Elvis to be had by his kin after his death, based on the "treatment of similar rights". *Id* at 960. Therefore, "similar rights" can also include similar liabilities and duties that real property owners hold and extend to intellectual property owners.

75.     Further, it is codified in U.S. law that public figures and endorsers who fail to warn and misrepresent with the products that they endorse, can be held liable. *15 U.S.C. 45(a)(1) and 16 C.F.R. 255.1(a),* which states that "endorsements must always reflect the honest opinions, findings, beliefs, or experience of the endorser. Furthermore, they may not contain any representations which would be deceptive or could not be substantiated if made directly by the advertiser", coupled with *16 C.F.R. 255.5(b),* which says that the use of a disclaimer (or warning) could prevent FTC civil action.

76.     And though the FTC Guides lack the force of law, they can be used in deference since they have the power to persuade. *United States v. Mead Corp.,* 533 U.S. 218, 234-35, 121 S. Ct. 2164, 150 L. Ed 2d 292 (2001). See *In re Diamond Mortgage Corporation of Illinois* (Bankr. Court, ND Illinois 1989) (held that celebrity endorsers must obtain reliable and independent information regarding the products or services they endorse; admits that this decision "may well induce more caution") and *The Right of Publicity vs. the First Amendment: A Property and Liability Rule Analysis.* 70 Ind. L.J. 47 (1994-1995).

77.     In addition, in 2017, the FTC sent 47 different celebrities letters warning them that their social media contained misrepresentations and cautioned them to include disclaimers. *FTC Issued Warnings to 45 Celebrities Over Unclear Instagram Posts.* WWD. (2017). (http://wwd.com/business-news/media/ftc-issued-warnings-to-45-celebrities-over-unclear-

instagram-posts-10883342/). It should be important to note that Plaintiff is not arguing that Swift is in violation of cited federal regulations, rather that regulations are presented as persuasiveness to help establish defendant's duty.

78.    Lastly, common law and both mandatory and persuasive precedent has held that  a defendant's liability hinges on "the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach". *Henderson v. US,* 846 F. 2d 1233 (9th Cir. 1988).

79.    For a note of reference: the entertainment industry already has disclaimers in many aspects of the business. At the end of movies with animals doing stunts, there will be a disclaimer that has a PETA stamp of approval saying that no animals were injured in the making of the movie, to avoid animal cruelty lawsuits. In other instances, there will be disclaimers disclaiming that the movie was not based on any real people or events. This is commonly referred to as an "All Person's Fictitious" disclaimer, which was created in response to a libel lawsuit from 1932. *Any Resemblance to Persons Living or Dead: Film and the Challenge of Authenticity.* Stanford.edu. (2016). The entertainment world therefore recognizes the need to mitigate risks with disclaimers. Why Swift, with her social influence and net worth, did not put into place any disclaimers with her stunts, is a legal and factual question that lies at the center of this case.

80.    The 9th Circuit held in the case of *Kennedy v. Bremerton School District* (9th Cir. 2017) that a public employee/public figure's speech and conduct becomes more scrutinized and is not protected by the First Amendment (the circuit ruled that the football coach acted as a public employee and praying on the field was not protected). Comparatively, Swift's conduct should be scrutinized given her public figure status.

17

81.     With all previous tort law framework laid out, Defendant Taylor Swift owed a duty to

Plaintiff to have disclaimers, based on public policy considerations, not just to him, but to all

consumers of her music; to those who follow her on her social media and who rely on her

representations, publicity and intellectual property. Greer was a fan and a consumer of Swift's

music. He was swayed by Swift's actions, spoken and written words, and stunts with other fans

that were clearly done for publicity and to sway.

82.     Swift's conduct created misrepresentations. Misrepresentations can be more than words –

they can include "conduct not in accordance with the truth", with no privity of contract required.

*RESTATEMENT (SECOND) of TORTS §525.* (1977).

83.     Swift's actions created subtle invitations and representations that she was open to Greer's

efforts, but instead, her words and conduct were misrepresentations that Plaintiff discovered by

having Swift call him "invasive" and "troubling", which created a chain reaction of bad events.

*Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 81 Cal. Rptr. 519 (1969) (A magazine had negligently

labeled defective shoes as "good", which resulted in harm to a consumer who relied upon the label and

purchased the shoes. Court held that the magazine was liable to third parties and those who weren't in a

contract with them; weighed public policy considerations, which was the deciding factor in finding

liability. *Hanberry* has been cited in the 6th Circuit, see *US Lighting Service, Inc. V. Llerrad Corp., 800 F.*

*Supp. 1513* (Dist. Court, ND Ohio 1992).

84.     Following the *Hanberry* ruling and the cases that have used *Hanberry* in many different

jurisdictions, public policy dictates that Swift should have used disclaimers in her publicity

stunts and intellectual property given the amount of public sway she has. See *Benco Plastics, Inc.*

*v. Westinghouse Electric Corp.,* 387 F. Supp. 772 (Dist. Court, ED Tennessee 1974) which

refused to consider *Hanberry* because of the lack of public policy consideration and because

plaintiff had not suffered physical harm, whereas Greer has listed the physical harm he has listed,

e.g. attempting suicide, being harassed by strangers and followed, etc, and has cited the obvious

public policy considerations with Swift.

85.     Swift should have foreseen that Greer and the millions of fans and consumers who follow her would be swayed by her actions, even if those actions did not mean to create invitations. Without disclaimers, there was no warning of the dangers of relying on Swift's intellectual property; of the dangers of investing money and time on an investment made to flatter her because Greer felt invited to do so. There was nothing Swift had put in place that would have lessened the losses Greer suffered; nothing to caution Greer to not put so much effort into impressing her because her actions and words created subtle invitations.

86.     Had Swift implemented disclaimers advising Greer and other fans and consumers that her stunts were just her being nice and limited for a rare occasion, like going to prom or a wedding, Greer would have not undertook the efforts he undertook and he would solely liable for any risk he partook in. See property law and other areas of law which have found that defendants' use of disclaimers absolved them of liability.

87.     With Swift's breach of duty to have disclaimers with her publicity stunts and intellectual property, Greer has incurred physical, emotional, economical and monetary damages. With the advent of search engines and gossip, troll sites, which Greer has been a victim of many troll sites, Greer's online presence and reputation has been ruined, damages that will follow him for the rest of his life, thus becoming lifelong harm.

88.     It is important to note that Greer has filed police reports in various jurisdictions against the trolls and online harassment against him, but to no avail have the authorities done anything, as the harassment is being perpetuated through the internet, internationally, and the trolls use fake IP addresses and aliases. Thus, it is appropriate for this complaint to be filed against Swift, as the harm can be traced back to her failure to warn, which Greer relied on Swift's stunts and made bold efforts of getting her attention, which also caught the attention of very vile and evil people.

89.     Indeed, "But For" Taylor Swift's lack of implementing disclaimers, Greer wouldn't have "gone to extremes", so to speak, to get Swift to see his efforts, such as initiating suit for the conduct of her agents. Greer wouldn't have been open about his intentions, putting him in the crosshairs of horrible people online who have harassed Greer and those close to him. Greer wouldn't have wasted two years and hundreds of dollars creating a gift for Swift, ending up hiring a mediocre production company, created in reliance of her accepting other gifts. And most importantly, Greer wouldn't have given very real effort, only to find out that Defendant Swift thought of Greer as "invasive" and "troubling", which her words, spoken through her attorney, created problems separate from everything else: being picked up by international news stations, increasing the harassment against Greer; getting Greer fired from four jobs in a span of 6 months; being unable to find professional work; getting evicted from homes. The largest damage of all is knowing that Swift carelessly uses her publicity and will essentially pour salt in the wounds Greer has suffered by continuing to feature random fans, while belittling Greer with her actions. Swift's actions are damning, careless and extremely negligent.

90.     Based on the severity of the harm Greer has suffered and Swift's breach of duty to warn, a jury at trial should determine the facts and determine whether Swift should be found liable for 100 million dollars.

91.     Greer asks for 100 million dollars for not only compensatory damages to compensate for harms suffered and harms that will follow Greer for the rest of his life, as long as Google and troll sites continue to exist, but he also asks for the amount to serve as punitive damages. The amount is fitting, as Swift has over 100 million Instagram followers that could potentially be harmed or may have already been harmed by Swift's lack of using disclaimers and warnings. Also, this is an amount that Swift can afford, given her net worth. The asked for damages are also enough to cause Swift to reflect deep and invoke change in how she does publicity stunts.

## COUNT II

## DECLARATORY JUDGMENT

92.     Russell Greer realleges each and every allegation in paragraphs 1 through 91 as if fully set forth herein.

93.     Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is, or could be, sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

94.     By reason of the foregoing, there is a present controversy between Russell Greer and Taylor Swift for which a declaratory judgment should be entered.

95.     Russell Greer has no adequate remedy at law.

## TRIAL BY JURY

96.     Russell Greer hereby requests trial by jury on all issues wherein trial by jury is permissible.

## PRAYER FOR RELIEF

WHEREFORE, Russell Greer prays for judgment against Taylor Swift as follows:

(1)         Compensatory and punitive damages in an amount of $100,000,000, to be found by a jury in accordance with the facts.

(2)         A preliminary injunction on Taylor Swift's *Reputation* tour, halting it from performing on its scheduled international tour, until the duration of the trial to determine whether Swift must implement disclaimers with her publicity stunts and marketing, and to prevent further harm upon Greer and others.

(4)         An order requiring Taylor Swift to implement disclaimers with her publicity stunts and marketing.

(5)         An award of actual and reasonable attorneys' fees and costs for services

rendered to Russell Greer in this action;

(6)             An award of pre- and post-judgment interest;

(7)             Russell Greer be awarded trial by jury on all issues triable by jury; and

(8)             Such other and further relief as the Court deems just and proper.


DATED:  April 18th, 2018

Respectfully submitted,



By:

Russell Greer
Pro Se Litigant
/rgreer/